UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NORTH OKALOOSA MEDICAL CENTER,

    Plaintiff,

v.                                                                                                                       3:07cv26-WS

MICHAEL O. LEAVITT, in his capacity
as Secretary of the Department of Health
and Human Services,

    Defendant.

_____

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      The plaintiff, North Okaloosa Medical Center (the "Hospital"), seeks review of a Medicare reimbursement decision—a final administrative decision—issued by the defendant, Michael O. Leavitt, Secretary of the United States Department of Health and Human Services (the "Secretary").  The Secretary denied the hospital approximately $1.36 million in Medicare reimbursement payments for the cost reporting year ended March 31, 1998, under a program established by Congress to assist urban hospitals that treat a disproportionate share of low-income patients.

      Before the court at this time are the parties' cross-motions for summary judgment. Docs. 11 & 17.  The motions have been fully briefed, and the parties have been advised that the motions would be taken under advisement as of a date certain.  Having now reviewed the evidence, the arguments, and the law, the court finds that the Hospital is

entitled to summary judgment.

I.

The Medicare program, codified in Title XVIII of the Social Security Act, 42, U.S.C. § 1395, is a federally-funded health insurance program for the elderly and disabled. The United States Department of Health and Human Services ("HHS" or the "agency") administers the program through its Center for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"). Through its agents, called "fiscal intermediaries" (private entities, usually insurance companies), the CMS reimburses hospitals and other health care facilities—Medicare providers—for the cost of services rendered to Medicare beneficiaries.

Before 1983, Medicare reimbursed hospitals on the basis of each hospital's reasonable costs. The "reasonable cost" reimbursement basis was used for both inpatient and outpatient care. In 1983, concerned that hospitals lacked incentives to operate efficiently, Congress created a new system, called the "prospective payment system" ("PPS"), for reimbursement of a hospital's acute care inpatient services. For services other than inpatient acute care, hospitals continued to be reimbursed on a "reasonable cost" basis. Under the PPS, hospitals are reimbursed for inpatient acute care on the basis of prospectively-determined national and regional rates. The rates do not vary according to the actual costs of individual cases but are designed to capture what an efficient hospital would spend to treat patients falling within each of approximately 470 "diagnosis related groups."

When adopting the PPS, Congress not only authorized the Secretary to

implement the PPS but also instructed the Secretary to "take into account and to make appropriate exemptions, exceptions and adjustments for hospitals that serve a disproportionately large number of Medicare and low-income individuals." H.R. Rep. No. 98-25(I), at 141 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 360.  Congress was expressly concerned about "the potentially harmful impact of the prospective payment system on public and other hospitals serving a significantly disproportionate number of patients who have low income."  H.R. Rep. No. 98-861, at 1356 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 1445, 2044.

Despite Congress's instruction, the Secretary implemented the PPS without including an exception or adjustment for hospitals serving a disproportionate share of low income patients.  In January 1984, the Secretary's delegate for administration of the Medicare program announced that the Secretary "did not make special provisions for these hospitals in the regulations . . . because our current data do not show that an adjustment is warranted."  49 Fed. Reg. 234-01 (Jan. 3, 1984).  Congress responded by specifying that the Secretary "*shall*, prior to December 31, 1984 . . . develop and publish a definition of 'hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A' of Title XVIII of the Social Security Act."  Deficit Reduction Act of 1984, Pub. L. 98-369, § 2315(h), 98 Stat. 494, 1080 (1984) (emphasis added); see also Samaritan Health Center v. Heckler, 636 F. Supp. 503 (D.D.C. 1985) (ordering the Secretary to comply with Congress's directive on or before July 26, 1985).

When the Secretary continued to fail to comply with Congress's directive,

Congress itself enacted a law providing that, "[f]or discharges occurring on or after May 1, 1986, the Secretary shall provide, in accordance with this subparagraph, for an additional payment amount for each subsection (d) hospital which . . . serves a significantly disproportionate number of low-income patients." Comprehensive Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-272, 100 Stat. 82 (1986) (codified at 42 U.S.C. § 1395ww(d)(5)(F)(i) (1986)). Among other things, Congress specified that a hospital "serves a significantly disproportionate number of low income patients" for a given cost reporting period if the hospital "has a disproportionate patient percentage . . . which equals, or exceeds . . . 15 percent, if the hospital is located in an urban area and has 100 or more beds." Id. at § 1395ww(d)(5)(F)(v). Congress thus linked a hospital's eligibility for a disproportionate share adjustment to three distinct factors: the hospital's location, the number of its beds, and its low-income patient percentage.

Congress specified that a "disproportionate patient percentage" is based, in part, on "the number of [a] hospital's *patient days* for [a fiscal year] which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter." Id. at § 1395ww(d)(5)(F)(vi) (emphasis added). Congress explained:

> In developing the adjustment, the Committee searched for a proxy measure for low income. The Committee reviewed available information from the American Hospital Association and other sources and determined, after extensive review, that the use of the medicaid days as a proxy most accurately reflected the factor the Committee was trying to measure, the presence of low-income patients.

H.R. Rep. 99-241(I), at 595 (1985). Congress also explained:

> [T]he beds that should be counted should be staffed and

> available beds. The bed count would reflect beds staffed and
> available in the cost reporting period immediately prior to the
> cost reporting period for which the adjustment would be
> made.

Id. at 596. Congress thus linked the bed-count criterion to *available* beds and not to the actual use of the beds by acute care inpatients.[1]

To implement what has become known as the "disproportionate share hospital" ("DSH") adjustment, the Secretary adopted a regulation that provided in relevant part:

> (1) The factors considered in determining whether a hospital
> qualifies for a [DSH] payment adjustment include the number
> of beds, the number of patient days, and the hospital's
> location.
>
> (i) The number of beds in a hospital is determined in
> accordance with § 412.105(b).
>
> (ii) The number of patient days includes only those days
> attributable to areas of the hospital that are subject to the
> prospective payment system and excludes all others.
>
> (iii) The hospital's location, in an urban or rural area, is
> determined in accordance with the definitions in § 412.62(f).

42 C.F.R. § 412.106(a)(1) (1998). Like Congress, the Secretary linked eligibility for the DSH adjustment to three factors. Unlike Congress, the Secretary did not specify that the number of patient days was a factor to be used in determining the disproportionate

---

[1] As correctly noted by the Hospital, the amount of a hospital's DSH reimbursement is not based on the number of beds at the facility. Instead, the amount of the DSH payment is a function of the actual days of service provided to qualified low-income patients—i.e., payment is a function of patient days. Accordingly, when an inpatient bed lies empty or when it is used for non-PPS services, that bed is not generating countable patient days for purposes of calculating the amount of any DSH reimbursement.

Case No. 3:07cv26-WS

patient percentage.

As first adopted by the Secretary in 1988, the DSH regulation provided that "[t]he number of beds in a hospital is determined in accordance with § 412.118" (later codified as 42 C.F.R. § 412.105(b)).  42 C.F.R. § 412.106 (a)(ii)(3) (1988).  Section 412.118 provided that:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of *available bed days* during the cost reporting period, not including beds assigned to newborns, custodial care, and excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

42 CFR § 412.118(b) (1988) (emphasis added).  The Secretary's Medicare Provider Reimbursement Manual ("PRM")[2] further explained how to count "beds" for purposes of the DSH adjustment:

> A bed is defined . . . as an adult or pediatric bed (exclusive of beds assigned to newborns which are not in intensive care areas, custodial beds, and beds in excluded units) maintained for lodging inpatients, including beds in intensive care units, coronary care units, neonatal intensive care units, and other special care inpatient hospital units.  Beds in the following locations are excluded from the definition: hospital-based skilled nursing facilities or in any inpatient area(s) of the facility not certified as an acute care hospital, labor rooms, PPS excluded units such as psychiatric or rehabilitation units, postanesthesia or postoperative recovery rooms, outpatient areas, emergency rooms, ancillary departments, nurses' and other staff residences, and other such areas as are regularly

---

[2] The PRM is " 'the prototypical example of an interpretive rule issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' " Clark Regional Medical Center v. United States Department of Health & Human Services, 314 F.3d 241, 248 (6th Cir. 2002) (quoting Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99, 115 S. Ct. 1232, 131 L. Ed. 2d 106 (1995)).

> maintained and utilized for only a portion of the stay of patients or for purposes other than inpatient lodging."
>
> To be considered an available bed, a bed must be permanently maintained for lodging inpatients. It must be available for use and housed in patient rooms or wards (i.e., not in corridors or temporary beds). Thus, beds in a completely or partially closed wing of the facility are considered available only if the hospital put the beds into use when they are needed. *The term "available beds" as used for the purpose of counting beds is not intended to capture the day to day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.*
>
> *In the absence of evidence to the contrary, beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period.*

PRM § 2405.3(G) (emphasis added); A.R. at 235-36.

The PRM also provided an example to illustrate how beds should be counted for a particular cost-reporting period. Specifically, the PRM explained that, if a hospital has 185 certified acute care beds, including 35 beds that were in fact used to provide long-term care[3] rather than acute care, all 185 beds are used to determined the provider's total available bed days. In the words of the PRM: "Although 35 beds are used for long-term care, they are considered to be acute care beds unless otherwise certified." PRM § 2405.3(G)(2).

## II.

In this case, the parties agree that, for the relevant time period, the Hospital (1)

---

[3] Like the observation services that are at issue in this case, long-term care services are not reimbursed under the inpatient PPS.

Case No. 3:07cv26-WS

Page 8 of  15

had 100 licensed acute care beds available for inpatient services; (2) was designated by the Medicare program as an "urban" hospital for purposes of the DSH payment adjustment; and (3) furnished inpatient services to a qualifying number (over 15%) of low-income patients.  Specifically, with respect to the number and availability of acute care beds, the parties stipulated as follows:

- During the Relevant Time Period, 100 of the [Hospital's] licensed beds were licensed, available, and operated as acute care beds . . .

- During the Relevant Time Period, all 100 of [the Hospital's] licensed acute care beds were staffed and available for immediate use for inpatient hospital services, or were capable of being staffed and put into immediate (within 24 to 48 hours) used for such inpatient hospital services.

- During the Relevant Time Period, the Hospital did not have a distinct observation unit, or separately designated area within the hospital for treatment of patients requiring observation services.

- Patients requiring observation care at [the Hospital's] facility were placed in licensed and available inpatient acute care beds to receive observation services.

- Observation patients in [the Hospital's] facility who, based upon their medical condition, were required to be admitted as inpatients, could remain in the same licensed available acute care inpatient beds.

- It was possible for the same licensed acute care bed to house an observation patient and an inpatient during the same day if the observation patient was discharged prior to the end of the day and the bed was needed for inpatient care.

A.R. at 313.

Case No. 3:07cv26-WS

The dispute in this case is about whether the Hospital had the requisite 100 inpatient acute care beds for purposes of the DSH adjustment.  According to the Secretary, the Hospital had fewer than 100 acute care beds for inpatient use because the Hospital sometimes placed outpatients requiring observation in acute care beds when those beds were not needed for inpatients.  The Hospital maintains that, despite the intermittent use by outpatients, all of its 100 licensed and staffed acute care beds should have been counted when determining the Hospital's 1998 eligibility for the DSH adjustment.

The parties' dispute arose on September 29, 2001, when the Medicare fiscal intermediary issued to the Hospital a notice of program reimbursement ("NPR") for the Hospital's Medicare cost reporting period ended March 31, 1998.  The fiscal intermediary determined that the Hospital had a count of fewer than 100 beds and was, therefore, ineligible for the DSH adjustment.  The Hospital appealed the intermediary's determination to the Provider Reimbursement Review Board ("PRRB"), which conducted a hearing and issued a decision in favor of the Hospital.  After reviewing the PRRB's decision on his own motion, the Secretary issued a final administrative decision reversing the PRRB.

III.

In Clark Regional Medical Center v. United States Department of Health & Human Services, 314 F.3d 241 (6th Cir. 2002), the Sixth Circuit addressed the precise issue that faces this court.  In the words of the Sixth Circuit, the dispute in Clark was "about whether hospital beds licensed for acute inpatient care, but used for other purposes

when not needed by inpatients, may be counted for purposes of a Medicare program designed to reimburse certain hospitals based on the number of available beds." Clark, 314 F.3d at 242.  The Clark court determined that, under the relevant regulations and interpretive rules,[4] hospital beds licensed and staffed for acute inpatient care, but used for other purposes when not needed by inpatients, should be counted for DSH reimbursement purposes.   The Clark court found that the Secretary's decision to the contrary was arbitrary, capricious, and otherwise not in accordance with the law.

The court in Clark began its analysis with 42 C.F.R. § 412.105(b), which in 1997 provided as follows:

> For purposes of this section, the number of beds in a hospital is determined by counting the number of available bed days during the cost reporting period, not including beds or bassinets in the healthy newborn nursery, custodial care beds, or beds in excluded distinct part hospital units, and dividing that number by the number of days in the cost reporting period.

42 CFR § 412.105(b) (1997).[5]  The court concluded that, because the regulation specifically listed certain types of beds that were excluded from the bed count without listing the particular beds at issue in Clark (swing beds and observation beds), "the plain

---

[4] The Clark court examined the relevant regulations and rules that were in effect in 1997, the cost reporting year at issue in that case.  The relevant regulations and rules for the cost reporting year at issue in this case were the same as the regulations and rules examined by the Clark court.

[5] Under 42 C.F.R. § 106(a)(1)(i) (1997), the number of beds for purposes of the DSH adjustment was to be calculated in accordance with section 412.105(b), which governed additional payments to hospitals for the indirect costs for graduate medical education programs.

meaning of the regulation suggests that it is permissible to count swing and observation beds" for DSH purposes. Clark, 314 F.3d at 247.[6]

The Clark court next turned to the PRM, which expressly provided that "beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period." Clark, 314 F.3d at 247 (quoting PRM § 2405.3(G)). Because the beds at issue in Clark—swing beds and observation beds—were located in the acute care area of the plaintiff hospitals (not in an excluded area) and because those beds were always staffed and available for acute care inpatients if needed, the court found that, under the PRM's express terms, there was a presumption that the beds at issue were to be included in the count of available beds.

The Clark court also found the following PRM provision significant:

> The term "available bed" as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used. Rather, the count is intended to capture changes in the size of a facility as beds are added to or taken out of service.

Id. The court concluded that "the use of acute care beds as swing and observation beds when not being otherwise used for acute care patients is precisely the type of day-to-day fluctuation that should not be captured when counting beds under § 412.105(b)." Id. at 248. The court went on to state that "[t]he day-to-day, or perhaps even hour-to-hour,

---

[6] In its decision, finding in favor of the Hospital in this case, the PRRB wrote: "The Board finds that the controlling regulation, 42 C.F.R. § 405.105(b), establishes the fundamental methodology for determining a hospital's bed size for purposes of DSH eligibility and requires that all beds be included in the calculation unless they are specifically excluded under the categories listed in the regulation." A.R. at 31.

change in the occupancy of these beds does not reflect the overall size of the Plaintiff hospitals, which is what the bed count is intended to capture." Id. at 249-49.

Two district courts have since relied on Clark to conclude that, under the same regulations and rules that are relevant in this case, observation bed days could not be excluded when determining the count of available beds for DSH purposes. Odessa Reg'l Hosp. v. Leavitt, 386 F. Supp. 2d 885, 886 (W.D. Tex. 2005) (concluding that "the plain meaning of 42 C.F.R. § 412.105(b) requires that all beds not specifically excluded should be included in the Disproportionate Share Hospital eligibility calculation and the Defendant's own Provider Reimbursement Manual guidelines support the inclusion of observation beds in the eligibility count"); Highland Med. Ctr. v. Leavitt, Civ. Action No. 5:06-CV-082-C (N.D. Tex. 2007) (finding it impermissible for the Secretary to exclude—from the DSH calculation—beds that were intermittently used for outpatient observation purposes). The parties have not cited, nor has this court found through its independent research, any case that has concluded otherwise.

IV.

The Secretary urges this court to reject the conclusions reached by the Clark, Odessa, and Highland Medical courts. The Secretary instead urges the following proposition—namely, that "observation bed days" must be excluded from the count of available beds because observation bed days are not recognized under PPS as part of the inpatient operating costs of a hospital. In other words, the Secretary contends that a hospital's bed count for purposes of DSH eligibility is a function of the use to which those hospital beds are put. The court, however, finds no support for such proposition in the

Case No. 3:07cv26-WS

relevant statute, regulations, or guideline manual.[7]

The court agrees with the reasoning of the Clark, Odessa, and Highland Medical courts. Congress provided that "beds" for DSH bed-counting purposes must be "staffed and available." H.R. Rep. 99-241(I), at 596 (1985). Congress said nothing about the use to which the beds were put. The Secretary's own regulation provided that "the number of beds in a hospital is determined by counting the number of *available bed days*." 42 C.F.R. § 412.106(a)(1)(i) (1998) (emphasis added). The Secretary's PRM explained that "[t]he term 'available beds' as used for the purpose of counting beds is not intended to capture the day-to-day fluctuations in patient rooms and wards being used." PRM § 2405.3(G)). Rather, the count of "available beds" was "intended to capture changes in the size of a facility as beds are added to or taken out of service." Id. Furthermore, the PRM provided that "beds available at any time during the cost reporting period are presumed to be available during the entire cost reporting period." Id. To make matters even more clear, the PRM provided an example: in a hospital having 185 certified acute care beds, all 185 beds were counted for DSH purposes, even though 35 of those beds were used for non-PPS long-term care. As stated in the PRM: "Although 35 beds are used for long-term care, they are considered to be acute care beds unless otherwise certified." Id.

The example given in the PRM is consistent with an example provided by the

---

[7] It is interesting to note that, while the Secretary argues that a licensed acute care bed may not be counted when it is utilized for purposes other than inpatient acute care, he presumably concedes that the regulations allow an empty bed to be counted if it is kept staffed and available for inpatient acute care.

Secretary in his 1995 response to a commenter's question regarding the agency's bed-counting policy. At that time, the Secretary stated:

> Our bed counting policy . . . ha[s] consistently followed the general principle that we do not attribute costs or days to individual beds, but rather to units or departments. *Therefore, individual beds that are occasionally used to treat less healthy infants, but that are located within a regular, healthy baby nursery, continue to be treated as part of the unit in which they are located, that is, as part of the healthy baby nursery.*

60 Fed. Reg. 45778, 45811 (Sept. 1, 1995) (emphasis added). As applied to the baby beds, the Secretary's rule resulted in all beds in the healthy baby nursery being excluded from the DSH bed count, even when some of those beds were occasionally used for PPS-covered services. Although the result in the PRM example was different (namely, all beds in the acute care unit were included in the DSH bed count even when some of those beds were used for non-PPS-covered services), the policy was the same: "[W]e do not attribute costs or days to individual beds, but rather to units or departments." Id.; see also Clark, 314 F.3d at 249 (noting that the number of beds in a hospital is determined in accordance with section 412.105(b) irrespective of whether the hospital is helped or hurt by the bed count; rejecting the Secretary's attempt to construe section 412.105(b) "so as to offer the least advantage to the hospital").

As the court did in Clark, this court finds that the Secretary's decision—to disallow beds that were concededly staffed and available for acute care inpatient use at all times during the cost reporting period—cannot be reconciled with the clear language of the Secretary's own regulations and interpretive rules. Because the court finds that the Secretary's decision was arbitrary, capricious, and otherwise not in accordance with the

law and the evidence, it is ORDERED:

1. The Hospital's motion for summary judgment (doc. 11) is GRANTED.

2. The Secretary's motion for summary judgment (doc. 17) is DENIED.

3. The Secretary's decision is VACATED, and the decision of PRRB is REINSTATED.

4. The clerk shall enter judgment in the Hospital's favor.

5. The case shall be REMANDED to the Secretary for payment to the Hospital of the appropriate DSH adjustment, with interest, for the fiscal year ending March 31, 1998.

DONE AND ORDERED this ___11th___ day of ___January___, 2008.

                            s/ William Stafford
                            WILLIAM STAFFORD
                            SENIOR UNITED STATES DISTRICT JUDGE